UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MARTEZE HALIBURTON,**<br><br>Plaintiff,<br><br>v.<br><br>**CITY OF FERNDALE, et al.,**<br><br>Defendants. | **2:21-CV-10864-TGB-APP**<br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(ECF NO. 35)** |

After being pulled over for speeding on Eight Mile Road in Detroit by Ferndale Police Officer Kevin Jerome, vehicle passenger Marteze Haliburton was removed from his car and frisked by Officer Jerome. Haliburton claims that the frisk later evolved into a full body-cavity search, while the Ferndale officers say that their actions were not so intrusive.

Plaintiff Haliburton brought suit against Defendant Officers Nathan Bodendorfer, Justin Harwood, Kevin Jerome, Brandon Szczesniak, and the City of Ferndale for violating his constitutional rights. After Haliburton's claims against Harwood and Bodendorfer were dismissed, [1] the following constitutional claims under 42 U.S.C. § 1983 remain:

---

[1]     On February 4, 2022, the Court denied in part and granted in part Defendants' motion for judgment on the pleadings. The Court specifically

1

1. Fourth Amendment claim against Jerome in his individual capacity;
2. Fourteenth Amendment claim against Jerome in his individual capacity;
3. Fourth Amendment claim against Szczesniak in his individual capacity; and
4. Fourth Amendment claim against the City based on *Monell* liability.

Defendants now move for summary judgment on these remaining claims. ECF No. 35. For the reasons detailed below, Defendants' Motion for Summary Judgment is **DENIED in part** and **GRANTED in part.**

## I.   BACKGROUND

On the evening of May 1, 2019, Haliburton was a front-seat passenger in a rental car being driven by Deon Frazier on the Detroit side of Eight Mile Road, heading east. Defendants' Motion for Summary Judgment, ECF No. 35, PageID.380; Plaintiff's Opposition to Motion for Summary Judgment, ECF No. 42, PageID.578. At approximately 7:50pm, Ferndale Police Officer Jerome pulled Frazier and Haliburton over for speeding. ECF No. 42, PageID.578; Defendants' Exh. 1 (Jerome Body

---

dismissed Haliburton's Fourteenth Amendment claim against the City, and Haliburton's Fourteenth Amendment claim against Szczesniak, Harwood, and Bodendorfer in their individual and official capacities. Order, ECF No. 21, PageID.216. On August 30, 2022, Haliburton stipulated to the dismissal of all remaining claims against Harwood and Bodendorfer. Stipulation and Order, ECF No. 32.

Camera Footage), 0:52–0:59.[2] Upon seeing Jerome's overhead lights, Frazier pulled the car into the fuel service plaza of a Meijer shopping center and parked in front of a gas pump. Defendants' Exh. 3 (Jerome In-Car Camera), 1:50–2:14.

After stopping behind the rental car, Jerome exited his police cruiser and approached Frazier from the driver's side window. ECF No. 42, PageID.578; Defendants' Exh. 1, at 0:03. While Haliburton provided Jerome with the rental car paperwork and his driver's license, Frazier explained that he did not have his license, but was driving because Haliburton had been driving all day from Atlanta. ECF No. 35, PageID.380; ECF No. 42, PageID.578–79; Defendants' Exh. 1, at 0:17–0:50. Jerome asked whether Frazier or Haliburton had any weapons or narcotics in the vehicle. Defendants' Exh. 1, at 1:06–1:09. Haliburton responded that he had marijuana and offered to produce his medical use card, but Jerome acknowledged that it was unnecessary given the legality of marijuana for personal use in Michigan. *Id.* at 1:09–1:16.

Jerome then asked whether Frazier and Haliburton would have any "problem" with him searching the car, specifically noting that they should have "no problem" with a search "if there's just weed." *Id.* at 1:18–1:21. Haliburton does not appear to dispute that he and Frazier

---

[2] The body camera footage submitted by Defendants as exhibits to their motion for summary judgment do not bear the time stamps referenced by Defendants in their briefing. As such, the Court cites to the body camera footage in minutes and seconds denoted by the media player time bar.

consented to the vehicle search. ECF No. 42, PageID.579 (emphasizing that "Jerome never asked Haliburton's consent for a body search," but not disputing Haliburton's consent to the car search); Haliburton Dep. (Apr. 26, 2022), ECF No. 35-10, PageID.490–91 (Haliburton agrees that he was "allowing [Jerome] to search" the car in shaking his head to indicate that there "wasn't a problem to let him search the vehicle"); Defendants' Exh. 1, at 1:21 (Jerome body camera footage showing Haliburton providing nonverbal assent to the search of the car, but obstructing view of Frazier and lacking discernable audio). Shortly after asking to search the car, Jerome returned to his police cruiser. Defendants' Exh. 1, at 2:07.

While in the police cruiser, Jerome radioed for backup. *Id.* at 3:55–4:15. Jerome also ran Haliburton's and Frazier's information through the Law Enforcement Information Network ("LEIN") using his in-car computer and evaluated the rental car paperwork. Jerome found that Frazier's license was suspended and that the car was rented in Tennessee. Jerome Dep. (Apr. 28, 2022), ECF No. 35-3, PageID.435; ECF No. 42, PageID.579. This was inconsistent with Haliburton's statement that the two were coming from Atlanta. The LEIN system also indicated that Haliburton had a valid outstanding warrant for domestic violence, but Jerome did not discover this warrant when conducting the on-scene information check. ECF No. 35, PageID.381. Jerome returned to the vehicle with Haliburton's license and the paperwork, ordered Frazier to

4

exit the vehicle, and searched Frazier's person. ECF No. 35, PageID.381; ECF No. 42, PageID.579. As he searched Frazier, Jerome asked Frazier how much cash he had with him, to which Frazier responded, "probably a couple [thousand dollars]." Defendants' Exh. 1, at 7:36–7:40. After completing his search, Jerome asked Frazier to sit on the vehicle's rear bumper. *Id.*

Before Jerome approached Haliburton, who remained in the front passenger seat of the vehicle, Officer Harwood arrived on the scene in response to Jerome's backup call. ECF No. 35, PageID.381. Jerome ordered Haliburton to exit the vehicle, but assured him that he was "not under arrest." Defendants' Exh. 1, at 8:09–8:22. Jerome instructed Haliburton to face the car and place his hands behind his back, as Jerome used one hand to hold Haliburton's hands together behind Haliburton's back, while patting down Haliburton with his other hand. *Id.* Jerome also asked Haliburton whether he had "a bunch of cash on him," to which Haliburton responded that he had more than $700. *Id.* at 8:22–8:28. Unlike his request for consent to search the vehicle, Jerome did not ask for consent to search Haliburton's person.

In performing the patdown, Jerome opened the pockets of Haliburton's sweatpants to look inside, *id.* at 8:23–8:33, while also patting the outside of Haliburton's pant legs and waistband. *Id.* at 8:33–8:36. Jerome asked Haliburton to spread his feet so that Jerome could pat the inner thigh area of his pants. *Id.* at 8:36–8:37. While Haliburton's

legs were spread, Jerome also reached his hand between Haliburton's legs into Haliburton's covered "crotch area," which Jerome understood to be "[t]he penis, the testicles, the groin area, [and] the area . . . beneath [the] testicles" at the base of the buttocks. *Id.* at 8:39; ECF No. 35, PageID.382; ECF No. 42, PageID.579–80. From his body camera video, Jerome can be seen rapidly swiping his hand back-and-forth between Haliburton's crotch area approximately five times, and he appears to use his fingers to briefly manipulate an object he detected. Defendants' Exh. 1, at 8:39–8:41; ECF No. 35, PageID.383. Jerome then asked Haliburton what object he purportedly had in his crotch area. Defendants' Exh. 1, at 8:40–43. Haliburton responded that he had "nothing." *Id.* at 8:43–8:44.

While handcuffing Haliburton, Jerome instructed him not to "tense up," and asked Haliburton again what he had "crotched." *Id.* at 8:45–9:00. After Haliburton was handcuffed, Jerome pulled up the back of Haliburton's jacket and shirt, momentarily exposing his bare back, and ordered Haliburton to turn to face him. *Id.* at 9:02–9:04. Jerome also lifted and replaced the front Haliburton's shirt twice, exposing his bare side and abdomen. *Id.* at 9:04–9:08. With part of Haliburton's shirt lifted, Jerome pulled the waistbands of Haliburton's sweatpants and his underwear away from Haliburton's body to shine a flashlight onto Haliburton's bare crotch area. *Id.* at 9:09–9:10. At this point, the body camera's view shifted slightly away from Haliburton's legs and crotch area, failing to capture what Jerome was doing as Haliburton said in a

6

surprised tone, "Whoa, what [are] you doing?" *Id.* at 9:10–9:13. Jerome ordered Haliburton to stop moving, to which Haliburton responded, "I'm not doing [anything] . . . You [were] going in my ass, grabbing me." *Id.* at 9:14–9:20.

Discovering no contraband after shining his flashlight at the front of Haliburton's crotch area, Jerome ordered Haliburton to turn around with his back facing Jerome. *Id.* at 9:20–9:22. Jerome lifted the back of Haliburton's jacket and shirt, pulled the waistbands of Haliburton's sweatpants and underwear away from Haliburton's body, and shined his flashlight to view the back of Haliburton's bare buttocks and crotch area. *Id.* at 9:23–9:25. Jerome repeatedly and loudly ordered Haliburton to "stop" resisting, while asking Haliburton, "what is that?" or "what's crotched?" *Id.* at 9:13–9:45.

Jerome and Harwood walked Haliburton back to a police cruiser, ordered him into the backseat while handcuffed, as Jerome asked Haliburton again what he had "crotched." *Id.* at 9:46–9:50. Jerome radioed for more backup, saying that Haliburton had "something crotched and [was] not letting me get it out." *Id.* at 9:57–10:01. Jerome and Haliburton then engaged in a heated exchange about whether Jerome acted illegally in searching Haliburton. Haliburton specifically accused Jerome of inserting his fingers into Haliburton's anus. *Id.* at 10:02–10:46. Jerome told Haliburton that when backup officers arrived, "we're going to get whatever you have out." Jerome also refused to adjust

Haliburton's handcuffs when Haliburton complained that they were too tight on his left wrist. *Id.* at 10:40–10:59. When Haliburton stated that he did not understand why "all of this is happening," Jerome responded that he knew Haliburton had "something crotched" and noticed Haliburton "moving all over the place" when he initially pulled over Frazier. *Id.* at 11:19–11:32. Haliburton denied that he was moving, and questioned how Jerome could have seen him moving as he was coming from behind to pull over Frazier. *Id.* at 11:30–11:34.

Moments later, Officer Szczesniak arrived on the scene. Jerome informed Szczesniak that Haliburton "has something crotched and is not letting us get it out." *Id.* at 11:43–11:49; ECF No. 35, PageID.384. Jerome then put on gloves before grabbing Haliburton's arm to remove him from the police cruiser. Defendants' Exh. 1, at 11:49–11:54. While Jerome commanded Haliburton to stop moving, Haliburton again complained that his handcuffs were hurting his arm. *Id.* at 11:50–12:03. As Haliburton stepped out of the vehicle, Jerome positioned himself to face Haliburton's backside, and Szczesniak approached to restrain Haliburton from the back left side of Haliburton's body. *Id.* at 12:13–12:20.

Jerome commanded Haliburton to stop stepping backwards, pulled the waistbands of Haliburton's sweatpants and underwear away from Haliburton's body and slightly downward, and exposed Haliburton's bare buttocks. *Id.* at 12:24–12:26. While the body camera's view could not capture Jerome reaching into Haliburton's underwear to search his bare

8

crotch area, Jerome retrieved a bag of orange pills within approximately five seconds. *Id.* at 12:26–12:31. Upon retrieving the bag, Jerome asked Haliburton what was in the bag; Haliburton quickly replied that he had a "prescription" for the pills. *Id.* at 12:30–12:38. Szczesniak responded to Haliburton's claim that he had a prescription by asking, "Why do you [have the pills] in your butthole then?" *Id.* at 12:36–12:39. Haliburton responded that it was because he did not have his "medicine bottle" with him. *Id.* at 12:39–41. Jerome then ordered Haliburton to spread his feet so that Jerome could pat the front side of Haliburton's pants. *Id.* at 12:39–12:46. Szczesniak and Jerome placed Haliburton back into the police cruiser as Haliburton protested the illegality of Jerome's conduct. *Id.* at 12:47–12:53.

Having completed his search of Haliburton, Jerome returned to search Frazier, placed Frazier under arrest, and started searching the rental car. *Id.* at 13:00–14:01. The vehicle search revealed marijuana, jewelry, cash, and cellphones. ECF No. 42, PageID.583. The pills found on Haliburton were later determined to be oxymorphone, a controlled substance. *Id.* And upon returning to the police station, Jerome found the outstanding arrest warrant for Haliburton that he had missed in the on-scene LEIN check. ECF No. 35, PageID.381.

## II.   LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any

affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In general, on a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001). But where a video accurately captures the events at issue, a court must "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

The party opposing summary judgment "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a

10

sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III. DISCUSSION

### A. Qualified Immunity Regarding Haliburton's Fourth Amendment Claim

Both Jerome and Szczesniak rely on qualified immunity to avoid liability in their individual capacities. "Qualified immunity is an affirmative defense shielding governmental officials from liability as long as their conduct does 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cartwright v. City of Marine City*, 336 F.3d 487, 490 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A qualified immunity defense triggers two inquiries: (1) whether the plaintiff's constitutionally protected rights have been violated; and (2) whether that right was "clearly established" at the time of the violation, such that a "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A court may address these two inquiries in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Ultimately, "[i]n the summary judgment posture, the case must go to the jury if the court finds that 'first, there are genuine issues of material fact as to whether [the Officers] violated [the plaintiff's] Fourth

Amendment rights in an objectively unreasonable way and, second, those rights were clearly established at the time of [the plaintiff's] arrest such that a reasonable officer would have known that his conduct violated them.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (alterations in original) (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005)).

### 1. Whether Haliburton Had a Clearly Established Constitutional Right to Be Free from an Unreasonable Frisk or Search

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear" in a "particularized" way to place a reasonable official on notice that their conduct violates that right. *Creighton*, 483 U.S. at 640. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citation omitted). As such, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Fourth Amendment protects individuals and their belongings from "unreasonable searches and seizures." U.S. Const. amend. IV. As relevant here, a vehicle passenger is "seized" for Fourth Amendment purposes when a police officer pulls over the driver. *Brendlin v. California*, 551 U.S. 249, 257–58 (2007). Once a vehicle has been

legitimately stopped based on reasonable suspicion of a traffic violation, an officer does not need any additional level of suspicion to "order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Nonetheless, "[t]o justify a patdown of the driver or a passenger during a traffic stop, however, . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *see also Ybarra v. Illinois*, 444 U.S. 85, 92–93 (1979) (describing "reasonable belief that [the subject of a frisk] was armed and presently dangerous," as "a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons").

A "patdown" of a passenger in a vehicle that has been legitimately stopped is governed under the same "stop and frisk" rules developed under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. *Johnson*, 555 U.S. at 327. Both the justification for the frisk and its scope must be reasonable. Consequently, even where a police officer has reasonable suspicion that a passenger is armed and dangerous, "a protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26); *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) (emphasizing that the purpose of a frisk "is not

13

to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence"); *Sibron v. New York*, 392 U.S. 40, 64–65 (1968) (finding a frisk unconstitutional where the officer "made it abundantly clear that he sought narcotics" in the defendant's pockets rather than conducting "a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault").

An officer "overstep[s] the bounds of the 'strictly circumscribed' search for weapons allowed under *Terry*" by "continued exploration" of the subject's clothing "after having concluded that it contained no weapon." *Dickerson*, 508 U.S. at 378. This includes "squeezing, sliding and otherwise manipulating the contents of [the subject's clothing]" after it is clear they are not carrying a weapon. *Id.* (quoting *State v. Dickerson*, 481 N.W.2d 840, 844 (Minn. 1992)).

To conduct more than a frisk of a person's outer clothing for weapons, the searching officer must have a warrant and probable cause. *Ybarra*, 444 U.S. at 96. In discussing the Fourth Amendment warrant requirement, the Supreme Court has held that "[t]he importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Schmerber v. California*, 384 U.S. 757, 770 (1966). And "absent an emergency," a search warrant is always required "where intrusions into the human body are concerned." *Id.* Furthermore,

14

while a search unequivocally requires probable cause and a warrant, the reasonableness of a search must be closely scrutinized where the search implicates "the individual's dignitary interests in personal privacy and bodily integrity." *Winston v. Lee*, 470 U.S. 753, 761, 767 (1985).

Under the protections afforded by the Fourth Amendment against unreasonable searches and seizures, Haliburton had a clearly established constitutional right to be free from an unreasonable frisk or search.

### 2. Is Jerome Entitled to Qualified Immunity in Connection with the Search of Haliburton?

The parties agree that Haliburton was subjected to an initial frisk just after he was removed from the vehicle and then a more invasive body search after he was handcuffed. Defendants first argue that Jerome was "justified" in frisking Haliburton during the traffic stop because he "reasonably believe[ed] that [Haliburton] was carrying drugs." ECF No. 35, PageID.406.

In defending the legality of Jerome's frisk and subsequent search, Defendants focus on arguing that Jerome did not actually perform a cavity search on Haliburton. *Id.* at PageID.406–11. Defendants contend that despite Haliburton's testimony to the contrary, the footage from Jerome's body camera (Defendants' Exh. 1) and their expert report by Dr. M.E. Boczar (Defendants' Exh. 12, ECF No. 35-13) make it unreasonable to conclude that a cavity search occurred during the initial frisk. As to

the initial frisk of Haliburton, this contention finds support in the record. While the body camera footage shows Jerome rapidly swiping and briefly manipulating the outer clothing of Haliburton's crotch area, it does not show any penetrating motions into Haliburton's covered anal cavity. Indeed, Haliburton testified that with respect to the initial frisk, he could not definitively say whether Jerome's fingers penetrated his covered anal cavity. ECF No. 42-7, PageID.776.

On the other hand, with respect to the subsequent search of Haliburton, which occurred after he was handcuffed, none of the video evidence shows what Jerome actually did. Defendants argue that Haliburton has failed to dispute Dr. Boczar's report concluding that no cavity search occurred. Defendants' Reply, ECF No. 44, PageID.970. But there is evidence that Jerome put on gloves, seemingly to search Haliburton's bare crotch area. And when asked about this second search during his deposition, Haliburton testified that Jerome "pull[ed] [the pills] out of my rectum." ECF No. 42-7, PageID.777. Without video evidence to refute Haliburton's testimony, a reasonable jury could conclude that—in actions not captured by the body camera and contrary to Dr. Boczar's opinion—Jerome could have penetrated (however briefly) Haliburton's anal cavity. In the absence of any clear video evidence, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Here, a genuine question of

fact has been raised as to whether Jerome conducted a cavity search at some point during his search of Haliburton.

It is important to note, however, that even if Jerome did not perform a cavity search, Defendants are not necessarily entitled to summary judgment. As explained above, and will be discussed in greater detail below, a frisk (of any degree of invasiveness) must be based on facts that would cause a reasonable officer to believe the subject may be armed and dangerous. *Terry*, 392 U.S. at 26. Moreover, Defendants neglect to explain how Jerome's actions in frisking and then more invasively searching Haliburton were objectively reasonable under the relevant Fourth Amendment principles. On the record evidence, a jury could quite reasonably conclude that Jerome violated Haliburton's clearly established Fourth Amendment rights in several ways, even absent a cavity search. Specifically, a reasonable jury could conclude that Jerome: (1) conducted a *Terry* frisk in the absence of any reasonable suspicion that Haliburton might be armed and dangerous; (2) exceeded the appropriate scopes of a reasonable *Terry* frisk and nonconsensual, warrantless search; and (3) lacked exigency or any other exception to the warrant requirement that would justify the warrantless search.

### 3. Whether Jerome Violated Haliburton's Clearly Established Fourth Amendment Rights

Because there are genuine disputes of material fact as to whether he violated Haliburton's clearly established Fourth Amendment rights,

Jerome is not entitled to qualified immunity. As noted above, a reasonable jury could find that Jerome's conduct violated Haliburton's clearly established Fourth Amendment rights in several ways. A reasonable jury could conclude that Jerome: (1) conducted a *Terry* frisk in the absence of any reasonable suspicion that Haliburton might be armed and dangerous; (2) exceeded the appropriate scopes of a reasonable *Terry* frisk and nonconsensual, warrantless search; and (3) lacked exigency or any other exception to the warrant requirement that would justify the warrantless search. Therefore, the Court cannot grant summary judgment on Haliburton's Fourth Amendment claims against Jerome.

### a. Whether a Reasonable Jury Could Conclude that Jerome Lacked Reasonable Suspicion to Frisk Haliburton

It is undisputed that Jerome had reasonable suspicion to stop Frazier and Haliburton after observing them speeding. But "[a] lawful stop does not necessarily carry with it the authority to conduct a pat-down search." *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005). Here, a reasonable jury could find that Jerome did not have reasonable suspicion that Haliburton was armed and dangerous, making the initial frisk unlawful.

Establishing reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and is "less demanding" than showing probable cause. *United States v. Sokolow*, 490

U.S. 1, 7 (1989). But an "inchoate and unparticularized suspicion or 'hunch'" will not suffice. *Terry*, 392 U.S. at 27. Because a *Terry* frisk requires reasonable suspicion that the person is armed and dangerous, "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* A person's suspicious conduct, furtive movements, nervousness, and evasiveness placed in context of an officer's experience and under the totality of circumstances can provide reasonable suspicion warranting a *Terry* frisk. *See id.* at 23–24, 27–28; *United States v. Arvizu*, 534 U.S. 266, 273–74, 277 (2002); *United States v. Carter*, 558 F. App'x 606, 611–12 (6th Cir. 2014).

Here, Defendants argue that Jerome's purported observation of Haliburton's furtive gestures, the rental car paperwork showing that the vehicle was rented in Tennessee when Haliburton said they were coming from Atlanta, the discovery of thousands of dollars in Frazier's pocket, and Haliburton's "arched back" while exiting the vehicle were sufficient to establish reasonable suspicion that Haliburton could be armed and dangerous. ECF No. 35, PageID.404–05. But a jury will need to determine the genuine issues of material fact as to whether Jerome's stated observations were true, and Defendants have not shown as a matter of law that Jerome had reasonable suspicion.

### i. Jerome's Observations of Purportedly Suspicious Conduct

Jerome testified that after activating his overhead lights, he saw Haliburton "moving around in a suspicious manner, possibly hiding contraband." Jerome Affidavit, ECF No. 35-20, PageID.544. And during his encounter with Haliburton, Jerome accused him of "moving all over the place," as Jerome pulled him over. Defendants' Exh. 1, at 11:19–11:32. But there is no video evidence that corroborates this account. Jerome's body camera only begins filming the interaction when he approaches Frazier from the driver's side window; it does not show what Jerome may have seen when he first began following the car and turned on his overhead lights.

Meanwhile, Jerome's in-car camera captures Jerome following the rental car for approximately one minute, and shows the car pulling over into the fuel service plaza of the Meijer shopping center. Defendants' Exh. 3, at 0:47–2:23. However, from the in-car footage, Haliburton is barely visible and this video does not reveal any noticeable suspicious movements by either Haliburton or Frazier. Nor does Jerome's body camera footage record Haliburton making furtive gestures during the initial interaction. Haliburton denies that he was moving when Jerome pulled the car over, and questioned how Jerome could have seen him moving at all. Defendants' Exh. 1, at 11:32–11:36. A genuine dispute of material fact remains as to whether Haliburton made furtive gestures,

and in turn, whether such suspicious movements can be considered in establishing reasonable suspicion for the initial frisk and probable cause for the subsequent search.

Defendants also claim that when Haliburton stepped out of the vehicle, "he is seen on video standing in a suspicious manner, arching his back . . . in an apparent attempt to conceal the recovered narcotics." ECF No. 35, PageID.381–82, PageID.405. But the video footage of this moment is ambiguous at best, and certainly does not compel the conclusion that Haliburton was attempting to conceal narcotics or anything else by slightly arching his back. From this evidence, a jury could conclude that none of Haliburton's movements created reasonable suspicion that he was armed and dangerous.

Furthermore, although Jerome discovered that the car was rented in Tennessee when Haliburton said they were coming from Atlanta, Frazier and Haliburton gave no inconsistent or dishonest answers about their travel. As Jerome frisked Frazier, Jerome asked Haliburton where they rented the car. Defendants' Exh. 1, 7:42–7:46. Haliburton responded that they had rented it in Tennessee—a statement consistent with what Jerome had discovered. *Id.* at 7:46–7:48. Jerome then asked whether Haliburton and Frazier were in Tennessee before going to Atlanta, and Haliburton confirmed that this was correct. *Id.* at 7:49–7:54. From that moment, there was no suspicious inconsistency between the information discovered in the rental car papers and the travelers' statements.

21

Although behavior "consistent with innocent travel" coupled with other conduct can still yield reasonable suspicion, *Sokolow*, 490 U.S. at 9, the record evidence here could go either way. A rational jury could conclude that under the totality of circumstances, Haliburton's behavior raised no articulable suspicion that he might be carrying a weapon. If so, a jury could conclude that the frisk was not justified. But such a conclusion depends on a reasonable jury's view of the facts.

### ii. Whether Jerome Had Reasonable Suspicion as a Matter of Law

Lastly, even assuming the validity of all of Jerome's claims that purport to establish reasonable suspicion, it does not follow that Defendants are entitled to summary judgment as a matter of law on this issue. The Supreme Court has recognized that traffic stops "involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). But it has never wavered from the clear limitation that frisks be conducted only "if there is a reasonable belief that [the persons stopped] are armed and dangerous." *Id.*; *see also Johnson*, 555 U.S. at 327; *Knowles v. Iowa*, 525 U.S. 113, 118 (1998).

In a case that closely tracks this one, the Sixth Circuit in *United States v. Wilson* held that an officer lacked reasonable suspicion to conduct a frisk of the defendant, a car passenger stopped for a minor traffic infraction. In *Wilson*, the officer stopped a vehicle because neither

22

the driver nor the defendant were wearing seatbelts. 506 F.3d 488, 490 (6th Cir. 2007). The officer discovered that the address on the driver's license did not match the city where the driver said he resided, and the driver admitted to having "served time on a federal gun charge." *Id.* at 490–91. The officer also claimed that both the driver and the defendant "were acting extremely nervous." *Id.* at 490. After running the car's license plate, the officer discovered that the car was not registered to either the driver or the defendant, and the two could not produce proof of registration or insurance when asked. *Id.* at 491. Citing the need for "officer safety," the officer then proceeded to pat down the defendant, and "a package wrapped in gray duct tape fell from one of [the defendant's] pant legs and landed on the ground." *Id.*

In affirming the district court's conclusion that the officer lacked reasonable suspicion to frisk the defendant, the *Wilson* court readily distinguished *United States v. Bell*, 762 F.2d 495 (6th Cir. 1985). In *Bell*, the Sixth Circuit upheld a frisk of a passenger, but "expressly declined to adopt a so-called 'automatic companion' rule whereby any companion of an arrestee would be subject to a [frisk]." *Wilson*, 506 F.3d at 494 (quoting *Bell*, 762 F.2d at 498). The *Wilson* court explained that contrary to *Bell*, where the driver was a known drug dealer and "the very purpose of the stop was to arrest that driver," the driver and the defendant in *Wilson* "were pulled over simply because they were not wearing their seat belts, a minor traffic violation." *Id.*

23

Furthermore, the court pointed out that even the driver's "spontaneous admission that he had served time on a federal gun charge does not suggest that '[he] was potentially armed.'" *Id.* Indeed, the court noted that "[i]f anything, the admission at that point in the traffic stop suggests cooperation with authorities, not resistance." *Id.* And even where the driver's actions "were undeniably suspicious and possibly indicative that [the driver] was involved in some sort of criminal activity," the *Wilson* court held that on the facts of the case, the officer lacked reasonable suspicion that the defendant, as a passenger, was armed and dangerous. *Id.* at 495.

Here, the facts relied upon by Jerome to support reasonable and particularized suspicion are arguably less compelling than what the officer had in *Wilson*. For example, based on Jerome's body camera footage, a reasonable jury could conclude that Haliburton did not appear particularly nervous in his initial interaction with Jerome. Just as in *Wilson*, Haliburton and Frazier were pulled over for a minor traffic violation, and there is no evidence that Jerome had independent knowledge of their criminal histories. Similarly, the fact that Frazier was carrying a large amount of cash—which is not a crime—does not produce reasonable, particularized suspicion that Haliburton was armed and dangerous. And because Jerome frisked Frazier first and discovered no weapons on his person, a reasonable jury could find that it was less reasonable for Jerome to suspect that Haliburton was armed. Thus, for

24

the same reasons articulated in *Wilson*, Defendants' reliance on *Bell* is equally misplaced.

Likewise, when asked if they had any weapons or narcotics in the car, Haliburton readily responded that he had marijuana, and even offered to produce a medical use card. This admission does not suggest that Haliburton was armed, but further demonstrated his compliance with Jerome's authority. Jerome also conceded that he did not see or smell any evidence of criminal activity when he was able to perceive the vehicle's interior. Jerome Prelim. Exam. (May 23, 2019), ECF No. 42-2, PageID.636, PageID.638–39.

Finally, Defendants claim that Jerome's subjective belief that he had probable cause validates the underlying frisk and search. ECF No. 35, PageID.406. Defendants also attempt to use the fruits of the search to argue that Jerome had reasonable suspicion and probable cause. *Id*. Neither of these arguments are supported by law. First, Jerome's "subjective beliefs about the search are irrelevant" to whether "a reasonable officer[,] . . . in light of clearly established law and the information the searching officers possessed" objectively had probable cause or reasonable suspicion. *Creighton*, 483 U.S. at 641. And second, "the discoveries of an illegal search cannot be used to validate the probable-cause judgment upon which the legality of the search depends." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 567 n.11

(1971). Therefore, Defendants have not established Jerome's reasonable suspicion as a matter of law.

### b. Whether Jerome Exceeded the Permissible Scopes of a *Terry* Frisk and Nonconsensual, Warrantless Search

In a post-hoc argument, Defendants point out that at the time of the stop, Haliburton had a warrant out for his arrest on a domestic violence charge. ECF No. 35, PageID.394. Although Jerome did not find or take note of this warrant when he ran Haliburton's name in the LEIN system, Defendants attempt to argue that "the late discovery of a valid arrest warrant renders the search reasonable and negates any contest to the search." *Id.* at PageID.390. Defendants point to no case law supporting such a proposition. And even if the officers had probable cause to arrest Haliburton, the existence of probable cause or a valid arrest warrant would not excuse a search that is unreasonable in scope. Therefore, summary judgment is inappropriate because a reasonable jury could conclude that Jerome's conduct exceeded the legal bounds of a *Terry* frisk and nonconsensual, warrantless search.

### i. The Supreme Court's Holdings in *Utah v. Strieff* and *Devenpeck v. Alford* Do Not Make the Search of Haliburton Per Se Reasonable

Defendants contend that the existence of a valid warrant for Haliburton's arrest—even though it was unknown to the officers at the time they arrested and searched Haliburton—bars Haliburton from

challenging the validity of his search and seizure.[3] Defendants concede that the Supreme Court has not directly addressed this issue, but they argue that this outcome is a natural "extension" of the Court's decisions in *Utah v. Strieff* and *Devenpeck v. Alford*. Specifically, Defendants ask this Court to adopt a rule in which a valid arrest warrant (including a warrant that the arresting officer was not aware of and is wholly unrelated to the alleged offense) renders any otherwise illegal search per se "reasonable." ECF No. 35, PageID.390. Neither *Strieff* nor *Devenpeck* support adopting such a rule.

First, as Defendants recognize, *Utah v. Strieff* is an exclusionary rule case. There, a police officer illegally stopped the defendant without reasonable suspicion or probable cause and discovered that the defendant had an outstanding arrest warrant for a traffic violation. 579 U.S. 232, 235 (2016). The officer then arrested the defendant pursuant to that

---

[3] While Defendants dedicate a significant portion of their briefing to defending the lawfulness of Haliburton's arrest, Haliburton does not challenge the arrest as an unlawful seizure under the Fourth Amendment. "[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Rouse v. Caruso*, No. 06-10961, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011), *report and recommendation adopted*, 2011 WL 893216 (E.D. Mich. Mar. 14, 2011) (quoting *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003)). Accordingly, the Court limits its analysis of Haliburton's Fourth Amendment claims to the initial frisk and subsequent search.

warrant, performed a search incident to arrest, and found drugs and drug paraphernalia on the defendant's person. *Id.* at 236. Although the officer stopped the defendant illegally, the Court held that the evidence seized need not be suppressed because the officer discovered the arrest warrant, and thus validly arrested and searched the defendant. *Id.* at 239. Accordingly, for exclusionary rule purposes, an officer's discovery of a valid arrest warrant constitutes an "intervening circumstance" that breaks "the causal chain between the unconstitutional stop and the discovery of evidence." *Id.* at 242.

Importantly, *Strieff* implicated only the effect of the outstanding warrant on the suppression of evidence as fruit of the poisonous tree under the *Brown v. Illinois*, 422 U.S. 590 (1975), exclusionary rule framework. The *Strieff* Court did not conclude that the initial illegal stop was rendered constitutional by the arrest warrant. Instead, it held that the exclusionary rule need not be applied because the valid arrest warrant sufficiently attenuated, or disconnected, the search incident to lawful arrest from the illegal stop.

Furthermore, *Strieff* did not address whether the defendant could have raised a valid claim under § 1983 for the illegal stop, nor did it suggest that the existence of an arrest warrant would prohibit a plaintiff from challenging the scope of a subsequent search incident to arrest. In fact, the *Strieff* Court explicitly recognized that if police officers perform illegal stops and searches, "[s]uch wanton conduct would expose police to

civil liability" under § 1983. 579 U.S. at 243; *see also Hudson v. Michigan*, 547 U.S. 586, 603 (2006) (Kennedy, J., concurring) (summarizing that while a knock-and-announce violation did not warrant suppression of evidence, § 1983 remedies are available for Fourth Amendment violations); *United States v. Alexander*, 540 F.3d 494, 504 (6th Cir. 2008) (affirming the district court's denial of the defendant's motion to suppress based on inevitable discovery doctrine, but noting that the defendant "is free to pursue a civil remedy via a § 1983 suit against [the police officers]").

Second, Defendants' position suggests that the existence of an arrest warrant makes any subsequent search per se reasonable. Such a rule would be a stark departure from bedrock Fourth Amendment principles. In general, "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18. But in Defendants' view, so long as officers have a warrant, they would be free to engage in any kind of conduct while performing an arrest and search. To the contrary, the Supreme Court has made abundantly clear that even where officers have a valid warrant, "[u]nreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time." *Los Angeles Cnty. v. Rettele*, 550 U.S. 609, 614 (2007). And despite the discretion afforded to officers in executing a valid search warrant, "[i]t is always the case, however, that 'the manner

in which a warrant is executed is subject to later judicial review as to its reasonableness.'" *United States v. Keszthelyi*, 308 F.3d 557, 571 (6th Cir. 2002) (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)).

Third, Defendants' reliance on *Devenpeck v. Alford* is unavailing. In *Devenpeck*, the Court held that the "[s]ubjective intent of the arresting officer . . . is simply no basis for invalidating an arrest." 543 U.S. 146, 154–55 (2004). In other words, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* at 153.

Defendants claim that although Jerome "missed" the valid warrant for Haliburton's arrest in his initial LEIN database search, the arrest should still be considered valid because "a veteran officer would have properly arrested Plaintiff on his outstanding warrant." ECF No. 35, PageID.394. But this case is on completely dissimilar factual footing from *Devenpeck*. There, the officers arrested the defendant for a crime that the facts did not support, while other facts known to the officers objectively supported an arrest for a different possible crime. 543 U.S. at 155–56. The *Devenpeck* Court thus considered the effect of all facts available at the time of arrest rather than the officers' subjective impressions.

Here, Jerome was not aware of the arrest warrant for Haliburton at the time he searched and arrested Haliburton. As the Court understands it, Defendants argue that because a valid warrant for Haliburton's arrest existed and Jerome *could have* found the warrant in

his LEIN search, Haliburton's arrest and subsequent search should be found to be lawful. But officers cannot invoke post hoc justifications or speculative theories about what a reasonable officer could have done to demonstrate probable cause at the time of arrest. Rather, probable cause "to justify an arrest means facts and circumstances *within the officer's knowledge* that are sufficient to warrant a prudent person . . . *in the circumstances shown*, [to believe] that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (emphasis added); *see also Creighton*, 483 U.S. at 641 (explaining that the "objective" inquiry for probable cause is based on "the information the searching officers possessed").

Similarly, Defendants suggest that based on circumstances completely unknown to the arresting officer, an officer's lack of probable cause at the time of arrest should be chalked up to a "reasonable mistake." ECF No. 35, PageID.396. Defendants provide no substantive support for such an argument, and the Court declines to adopt Defendants' unpersuasive reading of *Devenpeck*.

Lastly, apart from being devoid of any legal basis, Defendants' argument based on *Devenpeck* still fails because of the Fourth Amendment's reasonableness requirement. As noted above, if a hypothetical chain of events provided authority for a lawful search of Haliburton, the scope of that search must still be reasonable. And that is the gravamen of Haliburton's claim.

31

Because the Fourth Amendment unequivocally requires searches and seizures to be "reasonable" regardless of whether officers have a valid warrant, Haliburton's claim that the scope of the search was unreasonable persists. Summary judgment is improper because a reasonable jury could find that Jerome exceeded the well-defined scopes of a reasonable *Terry* frisk and search.

### ii.  Scope of a *Terry* Frisk

Where an officer has reasonable suspicion that a person is armed and dangerous, they are permitted to conduct a *Terry* frisk that is "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. Specifically, "[t]he search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron*, 392 U.S. at 65. The Supreme Court has thus underscored that "the investigative methods employed" during a *Terry* stop-and-frisk "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

There is ample record evidence here for a reasonable jury to conclude that Jerome exceeded the permissible scope of a *Terry* frisk. Defendants' invocation of the "plain feel" doctrine is also undermined by Jerome's body camera footage and the Supreme Court's holding in

32

*Minnesota v. Dickerson*. The *Dickerson* Court made clear that an officer exceeds the scope of a *Terry* frisk by "continued exploration" of the person's clothing "after having concluded that it contained no weapon." 508 U.S. at 378. But the Court recognized that "if an officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent*," the contraband may be lawfully seized. *Id.* at 375 (emphasis added). In *Dickerson*, however, the Court concluded that the officer could not rely on this "plain feel" exception to justify the frisk and contraband seizure at issue. Rather, the officer conducted "the sort of evidentiary search that *Terry* expressly refused to authorize," by manipulating the defendant's clothing after confirming that the hidden object was not a weapon, and being unable to immediately identify the "incriminating character" of the contraband through a lawful patdown. *Id.* at 378–79.

Here, Jerome's body camera footage clearly shows Jerome rapidly swiping his hand through Haliburton's crotch area at least five times, while also manipulating an area of Haliburton's pants using his fingers. Defendants' Exh. 1, at 8:37–8:41. Immediately after Jerome manipulated the object, Jerome asked, "What is that?" *Id.* at 8:41–8:42. Seconds later, Jerome asked Haliburton, "What's crotched, man?" *Id.* at 8:59–9:00. Before searching Haliburton's bare crotch area, Jerome asked Haliburton again what he was keeping "crotched." *Id.* at 9:48–9:50. And in radioing for backup, Jerome told the dispatcher that Haliburton has "something

crotched," but did not specify what he suspected the object to be. *Id.* at 9:58–10:02. Jerome later testified that he believed he felt "a bag with some kind of narcotic in it, . . . possibly pills or maybe crack." ECF No. 42-2, PageID.618. But crucially, Jerome admits that he "manipulated" Haliburton's pants to determine what the unknown object was, and confirms that he did not believe it was a weapon. ECF No. 42-2, PageID.645, PageID.647; ECF No. 42-4, PageID.696.

Furthermore, Jerome handcuffed Haliburton almost immediately after the initial frisk to investigate further.[4] Defendants' Exh. 1, at 8:55. After handcuffing Haliburton, Jerome lifted Haliburton's shirt to expose the waistbands of his pants and underwear, pulled Haliburton's waistbands away from his body, and shined a flashlight down the front of Haliburton's pants to view his bare crotch area. *Id.* at 9:02–9:11. And in actions not captured by Jerome's body camera, Haliburton asked Jerome in a distressed manner, "Whoa, what are [you] doing?" *Id.* at 9:11–9:15. Jerome then ordered Haliburton to turn around so that Jerome could use his flashlight to view Haliburton's bare buttocks. *Id.* at 9:17–9:24.

---

[4] The Court notes that while Jerome initially told Haliburton that he was not under arrest, Defendants' Exh. 1, at 8:21–8:24, the encounter escalated when Haliburton was handcuffed and detained for further search. But as noted above, because Haliburton does not rebut the legality of his arrest, the Court does not address any issues implicated with Haliburton's seizure.

To the extent that Defendants seek to justify Jerome shining his flashlight to view Haliburton's bare crotch area as part of a lawful *Terry* frisk, such a position is hardly tenable. The *Terry* Court acknowledged that even the limited frisk it authorized—patting the outer layer of a person's clothing—was a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly." 392 U.S. at 17. Here, a reasonable jury could find that Jerome's manipulation of Haliburton's clothing to view his bare buttocks and genitalia was highly intrusive, inflicted egregious indignity, and was unnecessary to ascertain whether Haliburton was concealing a weapon. Thus, a reasonable jury could conclude that Jerome's conduct exceeded the permissible scope of a *Terry* frisk.

In sum, a reasonable jury could find that Jerome would have been aware that the object in Haliburton's crotch area was not a weapon, and his repeated questioning of Haliburton suggested that he could not immediately identify the nature of the object (including whether it was incriminating) even with the impermissible manipulation. Given the similarity between the frisk found to be unconstitutional in *Dickerson* and Jerome's conduct here, there is a genuine issue of fact as to whether Jerome exceeded the scope of a *Terry* frisk and could not rely on the "plain feel" exception.

35

### iii. Scope of a Warrantless Search

Defendants concede that after the initial frisk, Haliburton was subject to "a second search," where Jerome retrieved the pills by reaching into Haliburton's bare crotch area. ECF No. 35, PageID.384. Assuming a search is supported by probable cause, it must also be reasonable. "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). Assessing the reasonableness of a search is particularly crucial where a search "intru[des] upon the individual's dignitary interests in personal privacy and bodily integrity." *Winston*, 470 U.S. at 761, 767; *see also Maryland v. King*, 569 U.S. 435, 446 (2013) (emphasizing that "virtually any" bodily intrusion constitutes "an invasion" of personal security subject to Fourth Amendment scrutiny).

The authority relied on by Defendants is inapt and easily distinguishable. Specifically, Defendants' reliance on *United States v. Doxey* is improper because *Doxey* centered around the search of a parolee. The *Doxey* court recognized that parolee searches require only reasonable suspicion, and the reasonableness of the search (which involved removing an object from between the parolee's buttocks) was more readily justifiable because of a parolee's limited privacy expectations. 833 F.3d 692, 704–05 (6th Cir. 2016). On the other hand, Haliburton's singular focus on arguing that an anal cavity search occurred does not assist the

Court in determining whether Jerome's conduct, which may have fallen short of a cavity search, was reasonable.

More on point is *United States v. Beauchamp*, in which the Sixth Circuit addressed circumstances similar to those here. In *Beauchamp*, an officer searched the defendant by "pull[ing] out his boxers and saw a piece of plastic sticking up between his butt cheeks," which the officer assumed was a drug baggie. 659 F.3d 560, 565 (6th Cir. 2011). After a second officer arrived, the officer "pulled [the defendant's] boxers back again and asked him what he had in his pants, between his butt cheeks." *Id.* The defendant then attempted to flee, but was restrained by the officers who proceeded to remove the baggie from the defendant's buttocks. *Id.* The *Beauchamp* court rejected the officers' argument that the defendant consented to the removal, and concluded that absent valid consent, "the search was unreasonable pursuant to the Fourth Amendment." *Id.* at 572.

On comparable facts here, a reasonable jury could conclude that even if Jerome had probable cause to search Haliburton, Jerome exceeded the permissible scope of a nonconsensual, warrantless search by reaching into Haliburton's bare crotch area to remove the bag of pills. Defendants concede that Jerome improperly assumed that he had consent to search Haliburton's person, as Jerome's body camera footage "demonstrates that he only asked to search the vehicle." ECF No. 35, PageID.393. And as addressed above, factual disputes remain as to the extent of Jerome's

intrusion on Haliburton's body. If Jerome penetrated Haliburton's anal cavity during his brief search, that would certainly be more intrusive than reaching into Haliburton's pants alone. But the act of manually searching a person's bare buttocks and crotch area to retrieve an object— even without conducting a cavity search—is still deeply offensive to the individual's bodily integrity and privacy interests.

Moreover, Defendants wrongfully minimize the fact that Jerome exposed Haliburton's bare buttocks during the search, which took place in a public area of a gas station. Indeed, the *Beauchamp* Court described the unreasonable act of "pull[ing] back [the defendant's] underwear on a public street and look[ing] inside" as the type of police misconduct that the exclusionary rule seeks to deter. 659 F.3d at 574. Consequently, a reasonable jury could find that Jerome's search to retrieve the bag of pills from Haliburton's person was unreasonable in scope.

### c. Whether There Were Exigent Circumstances Justifying the Warrantless Search

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Absent exigent circumstances, warrantless "intrusions into the human body" are plainly unlawful. *Schmerber*, 384 U.S. at 770. Furthermore,

"[u]rgent government interests are not a license for indiscriminate police behavior." *King*, 569 U.S. at 448.

Defendants make no effort to argue the presence of exigent circumstances to justify Jerome's warrantless search. Defendants merely continue to dispute Haliburton's claim that a cavity search occurred. ECF No. 35, PageID.409–11. Perhaps this is because, if anything, the record shows that no exigency existed. Although Jerome testified that he was concerned about destruction of evidence, ECF No. 42-2, PageID.658, a reasonable jury could conclude otherwise. By the time Jerome conducted the warrantless search, Haliburton was handcuffed in the back of a police car, and Jerome had been joined by several additional officers. A reasonable jury could find that Haliburton was physically unable to destroy evidence or flee under the circumstances. *Cf. Cupp v. Murphy*, 412 U.S. 291, 296 (1973) (holding that concerns about destruction of evidence allow for a "very limited search necessary to preserve the highly evanescent evidence" under the defendant's fingernails).

Furthermore, unlike in *Schmerber* where the defendant's blood alcohol level dissipating would interfere with the State's ability to secure time-sensitive evidence, 384 U.S. at 770–71, a reasonable jury could conclude that the pills in Haliburton's crotch area were not going anywhere. Jerome also conceded that he had time to drive Haliburton to the police station "for a more thorough search," but chose not to do so. ECF No. 42-2, PageID.652. Similarly, Jerome testified that he had an

opportunity to get a warrant after Haliburton was handcuffed in the back of the police car. ECF No. 42-4, PageID.704. But Jerome chose not to seek a warrant before proceeding with the nonconsensual search. As such, Defendants have not overcome the presumption that Jerome's warrantless search was per se unreasonable.

Because Defendants have failed to show their entitlement to judgment as a matter of law on Haliburton's Fourth Amendment claim against Jerome, the Court must deny summary judgment on this claim.

## B. Is Szczesniak Entitled to Qualified Immunity from Haliburton's Fourth Amendment Claims?

Szczesniak invokes qualified immunity against Haliburton's Fourth Amendment claims on grounds that he had no duty to intervene in Jerome's allegedly unlawful conduct. But genuine disputes of material fact remain as to whether Szczesniak had an opportunity to intervene, making summary judgment inappropriate.

## 1. Whether Haliburton Had a Clearly Established Constitutional Right to Szczesniak's Intervention

As a threshold matter, the Court must resolve whether Haliburton had a clearly established right to Szczesniak's intervention to prevent the allegedly unlawful search. "[W]hen looking to see if a clearly established right exists, we look to the decisions of the Supreme Court, of this circuit, and of courts within our circuit for guidance." *Barton v. Norrod*, 106 F.3d 1289, 1293 (6th Cir. 1997). Evaluating whether the plaintiff had a clearly established constitutional right is necessary to ensure that a reasonable

official has sufficient notice that their conduct is unlawful. *Creighton*, 483 U.S. at 640. But even under "novel factual circumstances," a court may find that officials were "on notice that their conduct violates established law." *Hope*, 536 U.S. at 741.

The Sixth Circuit's decision in *Bunkley v. City of Detroit* is instructive. In *Bunkley*, the Sixth Circuit concluded that under its precedent, the plaintiff had a clearly established right to expect that an observing officer would intervene in his unlawful arrest. 902 F.3d 552, 566 (6th Cir. 2018). The *Bunkley* court explained that while the Supreme Court "has not spoken on the issue of whether failure to intervene extends beyond the excessive force context," the Sixth Circuit has held that it does. *Id.* at 565; *see also Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001) (concluding that "officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights," without limiting this duty to excessive force situations). In *Bunkley*, the plaintiff sufficiently demonstrated that the observing officer had reason to know that the arresting officers lacked probable cause for the arrest—a blatant Fourth Amendment violation. 902 F.3d at 566. Accordingly, the court concluded that the observing officer was on notice that he had a duty to intervene in the unlawful arrest. *Id.*

The Court notes that neither party effectively addresses whether Haliburton had a clearly established constitutional right for Szczesniak

41

to intervene in the allegedly unlawful search. Haliburton fails to identify controlling case law governing an officer's duty to intervene in an unlawful search. Instead, Haliburton relies exclusively on *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019), a case decided after the instant search took place and involved failure to intervene in the excessive force context. And it appears that neither the Supreme Court nor the Sixth Circuit have specifically decided whether an officer has a duty to intervene in an unlawful search, as opposed to use of excessive force, *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982*)*, or unlawful arrest. *Bunkley*, 902 F.3d at 566.

But Defendants seem to accept that under Sixth Circuit precedent, observing officers have a general duty to intervene where another officer is violating a person's constitutional rights. ECF No. 35, PageID.387–88. Defendants also fail to present any substantive legal arguments against finding a clearly established constitutional right here. Rather, Defendants merely claim that Szczesniak would not have been on notice in May 2019 that he had a duty to intervene "in the short time span of the search." *Id.* at PageID.390.

Defendants have not contended that Haliburton's constitutional right to Szczesniak's intervention was so unclear that he lacked sufficient notice of a duty to intervene in an unlawful search. As addressed below, the amount of time Szczesniak had to intervene is an important factual dispute, but it is irrelevant to resolving the antecedent "clearly

established right" inquiry. Because the Sixth Circuit has determined that the duty to intervene extends beyond the excessive force context, Szczesniak had adequate notice that Haliburton had a clearly established constitutional right to his intervention in the allegedly unlawful search.

## 2. Whether Szczesniak Had a Reasonable Opportunity to Intervene

Defendants argue that Szczesniak "had no duty to intervene in either search of [Haliburton]" because "[h]e arrived on scene after the first search was complete and immediately prior to the second search." ECF No. 35, PageID.388. Because Haliburton does not attempt to argue that Szczesniak had a duty to intervene before he arrived, the Court addresses only Szczesniak's ability to intervene in the second search, where Jerome extracted the bag of pills after reaching into Haliburton's underwear.

"[M]ere presence . . . without a showing of some direct responsibility, cannot suffice to subject [an officer] to liability" for failure to intervene. *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013). But a police officer who fails to intervene in a constitutional violation "may be held liable when (1) the officer observed or had reason to know that [an unconstitutional action] would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Moreover, "the issue of whether an officer had sufficient time to intervene or was

capable of preventing the harm is a question of fact for the jury unless, based on all the evidence, a reasonable jury could not possibly conclude otherwise." *Bunkley*, 902 F.3d at 566.

There are genuine disputes of material fact as to whether Szczesniak observed or should have known that Jerome intended to conduct an unconstitutional search and whether Szczesniak had a realistic opportunity to intervene. First, Defendants emphasize that Szczesniak "could not have anticipated an anal cavity search." ECF No. 35, PageID.389. But as discussed above, a reasonable jury could conclude that Jerome's search was unconstitutional even if it was not a cavity search. Jerome's body camera footage reflects that as Szczesniak approached Jerome and Haliburton (who was handcuffed in the back of the police cruiser), Jerome was putting on gloves to prepare to conduct a nonconsensual, warrantless search of Haliburton. Defendants' Exh. 1, at 11:42–11:47. As Jerome put on the gloves, he narrated to Szczesniak that Haliburton "has something crotched . . . and he's not letting us get it out." *Id.* Szczesniak also testified that he recalled Jerome telling him that Haliburton "had something crotched," and Szczesniak believed that Jerome would "extract whatever he felt" in Haliburton's pants. Szczesniak Dep. (Apr. 27, 2022), ECF No. 42-5, PageID.720, PageID.727.

Szczesniak also agreed that if Jerome intended to reach into Haliburton's anal cavity, Jerome would have needed a warrant. *Id.* at PageID.727. Even assuming Szczesniak did not have specific knowledge

44

that Jerome would perform a cavity search, a reasonable jury could conclude that Szczesniak was aware that Jerome was about to conduct search of Haliburton's bare crotch area without any idea of what was there—meaning a search that potentially lacked probable cause and exceeded the scope of a permissible warrantless search.

Second, while the duration of Jerome's search of Haliburton was relatively short, a reasonable jury could find that Szczesniak had sufficient time to intervene in the leadup to the search. Jerome reached into Haliburton's pants and extracted the bag of pills within approximately five seconds, Defendants' Exh. 1, at 12:25–12:30. But Jerome's body camera footage demonstrates that Szczesniak had approximately 40 seconds to intervene before the search began. In the 40 seconds between Szczesniak's arrival and Jerome starting the search, Jerome informed Szczesniak that Haliburton had something crotched, Szczesniak's perceived that Jerome was about to perform a search inside of Haliburton's pants by putting on gloves, Szczesniak assisted in removing Haliburton from the police car, Szczesniak helped Jerome restrain Haliburton as Jerome positioned Haliburton for the search, and Szczesniak saw Jerome pull Haliburton's pants away from his body to expose his buttocks before reaching into Haliburton's pants. Defendants' Exh. 1, at 11:42–12:24; ECF No. 42-5, PageID.722.

Here, a reasonable jury could conclude that Szczesniak was not merely present at the scene, but he had a realistic opportunity to

intervene in unconstitutional conduct that he knew was about to occur. But rather than intervening, Szczesniak actively assisted Jerome to perform the unconstitutional search by restraining Haliburton. If Szczesniak had time to help Jerome in restraining Haliburton, it is reasonable that he had time to intervene and stop the search as well.

Given that the leadup to the search was significantly longer than a few seconds, the Court cannot hold that Szczesniak had insufficient opportunity to intervene as a matter of law. *See, e.g.*, *Goodwin v. City of Painesville*, 781 F.3d 314, 329 (6th Cir. 2015) (denying summary judgment where a reasonable jury could conclude that observing officers had sufficient time to intervene "during the 21-second tasering" of the plaintiff); *Guglielmo v. Montgomery Cnty.*, 387 F. Supp. 3d 798, 822 (S.D. Ohio 2019) (denying summary judgment where a reasonable jury could find that "forty-nine seconds is sufficient time for the officers to have recognized the use of excessive force and taken steps to stop it"); *Holloran v. Duncan*, 92 F. Supp. 3d 774, 794 (W.D. Tenn. 2015) (denying summary judgment where a reasonable jury could conclude that if the observing officer "was close enough" to help handcuff and move the plaintiff, "he was close enough to at least block" the excessive force, "even if the entire event took only seconds"). Therefore, Szczesniak is not entitled to summary judgment on Haliburton's duty to intervene claim.

### C. Whether Haliburton Presents a Genuine Issue of Material Fact on His Fourteenth Amendment Claim Against Jerome

Although Haliburton argues that both Szczesniak and Jerome discriminated against him because of his race, Haliburton's Fourteenth Amendment claim remains only against Jerome. Order, ECF No. 21, PageID.216 (dismissing Haliburton's Fourteenth Amendment claims against Szczesniak as a non-searching Defendant). Based on the record evidence as it relates to Jerome, summary judgment in favor of Jerome is warranted on Haliburton's Fourteenth Amendment claim.

"It is axiomatic that the Equal Protection Clause of the Fourteenth Amendment protects citizens from police action that is based on race." *Bennett*, 410 F.3d at 818. In cases involving allegations of racial profiling and disparate treatment by police, "[t]o show discriminatory effect, a plaintiff can proffer evidence showing similarly situated individuals of another race were treated differently through statistical evidence or identifying a person of another race who the police treated differently." *Id.* To find "discriminatory racial purpose," the Court must often make inferences "from the totality of relevant facts." *Washington v. Davis*, 426 U.S. 229, 241–42 (1976). And while "valid relevant statistical evidence of disparate impact or other circumstantial evidence" can be used to show discriminatory purpose, "[o]nly in rare cases will a statistical pattern of discriminatory impact conclusively demonstrate a constitutional

47

violation" without further support. *United States v. Avery*, 137 F.3d 343, 356 (6th Cir. 1997).

Haliburton points to a host of academic studies, reports, and news articles that describe the troubling effects of implicit and explicit racial bias in policing. Haliburton also argues that the Ferndale Police Department's 2019 "Use of Force" demographic summary indicates that "Black males are far more likely to be the victim of force by Ferndale police than any other demographic." ECF No. 42, PageID.598. In addition, Haliburton identifies a "racial divide" between Detroit and Ferndale. *Id.*

Even setting aside potential admissibility issues, these sources do not demonstrate that Jerome acted with discriminatory intent toward Haliburton "in *his* case." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). Indeed, besides the "Use of Force" demographic summary, none of the sources Haliburton identifies relate to Ferndale Police. Defendants have provided the full 2019 "Use of Force" report, which indicates that the instances of "force" in the demographic summary refer to "empty hand control" (physical engagement without using weapons); displaying and using firearms; and displaying and using tasers. ECF No. 44-2, PageID.983–84. Haliburton fails to show how the "Use of Force" demographic summary meaningfully supports his equal protection claim, especially given that the data is wholly unrelated to the allegedly unlawful search at issue. *See Avery*, 137 F.3d at 357 (concluding that

48

"statistics fell short of proving [the defendant's] prima facie case" of race discrimination because the data contained "independent deficiencies" that the defendant failed to explain).

As to Jerome specifically, Haliburton argues that the fact that Haliburton is Black and Jerome is white, Jerome's purported lack of reasonable suspicion to conduct the searches, and Jerome's refusal to loosen Haliburton's handcuffs are sufficient to demonstrate discriminatory intent. ECF No. 42, PageID.599. First, the fact that the defendant is white and the plaintiff is non-white, even coupled with allegations that the defendant treated other similarly situated persons more favorably than the plaintiff, are insufficient to show discriminatory intent "unless accompanied by some evidence" that the defendant actually gave preferable treatment to "similarly situated [persons] of a different race." *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009); *see also Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 575 (6th Cir. 2008) (affirming summary judgment on equal protection claim because the plaintiffs "fail[ed] to allege any specific examples of *similarly situated* individuals" who were treated differently). Haliburton acknowledges that he has not proffered any viable comparator evidence here.

Second, while Haliburton is correct that lack of reasonable suspicion "may be relevant to the question of whether the officer acted with a racially discriminatory intent," the Sixth Circuit has emphasized that "a lack of reasonable suspicion alone is insufficient to show such

intent." *Bey v. Falk*, 946 F.3d 304, 320 (6th Cir. 2019). And even coupled with Jerome's refusal to loosen Haliburton's handcuffs, there is insufficient evidence for a reasonable jury to conclude that Jerome was motivated by racial animus on this record. Because Haliburton has not identified evidence that Jerome "had a desire" to treat him "worse than other" arrestees, Defendants' motion for summary judgment on Haliburton's equal protection claim must be granted. *Ryan v. City of Detroit*, 698 F. App'x 272, 283 (6th Cir. 2017).

### D. Whether Haliburton Raises a Genuine Issue of Material Fact on Defendant City of Ferndale's *Monell* Liability

Haliburton argues that Defendant City of Ferndale failed to properly train its officers "on permissible and impermissible warrantless, non-consensual searches," and on conducting "strip and cavity searches." ECF No. 42, PageID.601–02. Because Haliburton cannot demonstrate a pattern of constitutional violations that the City ignored, he must show that a single instance of misconduct triggers liability.[5] Specifically, the single instance theory is reserved for "rare" situations where "the unconstitutional consequences of failing to train" were "so patently

---

[5] Defendants mistakenly contend that Haliburton must identify a "pattern" of deliberate indifference to succeed on a failure to train theory of *Monell* liability. ECF No. 44, PageID.978. Rather, demonstrating repeated constitutional violations is simply one way of proving deliberate indifference, while a single instance of injury may still trigger municipal liability under certain conditions. *Connick v. Thompson*, 563 U.S. 51, 64 (2011); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997).

obvious" to trigger municipal liability. *Connick v. Thompson*, 563 U.S. 51, 64 (2011). On this record, Haliburton has not raised a genuine dispute over the fact that the City trained its officers on permissible searches. Thus, Haliburton cannot establish deliberate indifference or causation.

In *Monell v. Department of Social Services*, the Supreme Court held that municipalities "may not be sued under § 1983 for an injury inflicted solely by its employees or agents" on a respondeat superior theory. 436 U.S. 658, 691, 694 (1978). Instead, a plaintiff must demonstrate that the municipality itself had an "official policy" that served as "the moving force of the constitutional violation." *Id.* at 694. A municipality's "failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). To succeed on a failure to train theory of *Monell* liability, the plaintiff must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Even training that is "negligently administered" or could be improved to avoid the injury at issue does not amount to deliberate indifference. *Harris*, 489 U.S. at 391. Nor does the fact that "a particular officer may be unsatisfactorily trained" trigger municipal liability. *Id.* at 390.

51

Haliburton claims that Ferndale police officers were inadequately trained on conducting warrantless, nonconsensual frisks and searches, but provides no substantive support for this theory. Moreover, Haliburton has failed to raise a genuine dispute of material fact as to whether the potential inadequacy of the training constituted deliberate indifference or caused the injury. Jerome testified that both the City and the police academy trained him on "the contours of the Fourth Amendment," including the scope of permissible searches and seizures. ECF No. 42-4, PageID.689. Jerome further explained that the City provided him with computer-based training on cavity searches. *Id.* at PageID.692. Szczesniak also recalled that the City trained him "on the parameters of the Fourth Amendment," including "how to search someone." ECF No. 42-5, PageID.717–18. Likewise, Szczesniak testified that the City trained him on conducting body cavity searches. *Id.* at PageID.718.

To rebut this testimony, Haliburton points out that Jerome could not recall who trained him on cavity searches and was not trained on the definition of "crotch area" and "buttocks." ECF No. 42-4, PageID.692, PageID.694. But Haliburton does not refute the fact that the City trained officers on permissible searches, nor has he articulated how the alleged lack of training caused his injury. *Compare Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020) (finding the city's "failure to provide any training on probable cause determinations or use of force" to

52

be "constitutionally inadequate"); *with Chaney-Snell v. Young*, No. 20-13064, 2022 WL 4667942, at *6 (E.D. Mich. Sept. 30, 2022) (concluding that "the record does not give rise to a claim under a theory of single-incident liability" where the officer undisputedly testified that the municipality trained him).

First, Jerome's inability to remember the name of the computer program or individual who provided the training does not undermine his undisputed testimony that the City trained him. *See Harris v. City of Saginaw*, No. 20-13075, 2022 WL 1609431, at *14 (E.D. Mich. May 20, 2022) (explaining that a police officer's "equivocation" on Fourth Amendment standards in her deposition testimony "says almost nothing about the City's training policy").

Second, no reasonable jury could conclude that improved training on the definition of "crotch area" and "buttocks" would have prevented the alleged constitutional violations here. While Jerome allegedly frisked Haliburton without reasonable suspicion and exceeded the permissible scopes of a frisk and warrantless search, Haliburton cannot tie Jerome's purported lack of anatomical understanding to the alleged Fourth Amendment violations he committed. *See Gambrel v. Knox Cnty.*, 25 F.4th 391, 410 (6th Cir. 2022) (concluding that the police misconduct that occurred "would not have been due to an absence of training," but rather "due to the 'intentional disregard' of that training"); *Harris*, 489 U.S. at 392 (emphasizing the need for courts to avoid engaging in "an endless

53

exercise of second-guessing municipal employee-training programs"). Therefore, even if the City was negligent in training Jerome in particular or Jerome disregarded his training, such conduct does not amount to deliberate indifference and is not causally related to Haliburton's injury. Thus, Haliburton has not raised a genuine dispute of material fact on the City's *Monell* liability.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **DENIED in part** and **GRANTED in part**. Plaintiff's Fourth Amendment claims against Defendants Jerome and Szczesniak must be tried by a jury. Plaintiff's Fourteenth Amendment claim against Defendant Jerome is **DISMISSED with prejudice**. Plaintiff's *Monell* liability claim against Defendant City of Ferndale is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Dated: January 27, 2023    s/Terrence G. Berg
                          TERRENCE G. BERG
                          UNITED STATES DISTRICT JUDGE